IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| The Inclusive Communities Project, Inc., | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | No. 3:17-CV-0206-K |
| | * | |
| Lincoln Property Company, | * | |
| et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

PLAINTIFF INCLUSIVE COMMUNITIES PROJECT, INC.'S
BRIEF IN RESPONSE TO  DEFENDANTS
LEGACY MULTIFAMILY NORTH III LLC
AND HLI WHITE ROCK LLC'S
RULE 12(b)(6) MOTION TO DISMISS

**Table of Contents**                                                      **Page No.**

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Claims covered by Defendants' motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The standard of review for Rule 12(b)(6) motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Complaint shows the existence of Lincoln's policy refusing to negotiate
with or rent to voucher households and its application to Defendants' properties . . . . . . . . . . . 1

Defendants go outside the Rule 12(b)(6) record to assert there is no policy,
only a non-discriminatory, discretionary, business judgment
not to participate in the voucher program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

The asserted origin of a policy in the discretionary business judgment of a
defendant does not insulate the policy from disparate impact review . . . . . . . . . . . . . . . . . . 5

The Complaint shows direct causation between the policy
and the exclusion of the predominantly Black voucher holders. . . . . . . . . . . . . . . . . . . . . . 7

The disparate impact burden does not require showing that the pre-existing
conditions of community wide racial segregation and discrimination
were caused by the Defendants' discriminatory housing practice . . . . . . . . . . . . . . . . . . . . . . . . 9

The Complaint shows that the extent of both discriminatory impacts -
adverse effect on a disproportionately Black group, voucher households,
and perpetuation of racial segregation - satisfy the prima facie case standard . . . . . . . . . . . . . 12

ICP's litigation that seeks remedies for local and federal government
racial segregation does not weaken the causal link between the
Defendants' policy and the discriminatory impacts caused by that policy . . . . . . . . . . . . . . . . 15

The pleading that the policy is not necessary for potential assertions of
business reasons is specific and set out with particularity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

The Complaint specifically shows less discriminatory alternatives to the policy . . . . . . . . . . . 17

There is no Fair Housing Act exemption for landlord discrimination
against voucher recipients . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

ICP can assert claims for disparate impact and
disparate treatment and prevail on both . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

The Complaint shows disparate treatment based on the modified
*McDonnell Douglas Corp.* framework as applied in Fair Housing Act cases . . . . . . . . . . . . . . 22

The Defendants' refusal to negotiate with or enter into leases with ICP
is disparate treatment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Vicarious liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Signature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Certificate of service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## Table of Authorities

**Cases**                                                                                                 **Page No.**

*Alexander v. Edgewood Mgmt. Corp.*, 2016 WL 5957673 (D.D.C. 2016) . . . . . . . . . . . . . . . . .  4

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Austin Apartment Ass'n v. City of Austin*, 89 F. Supp. 3d 886 (W.D. Tex. 2015) . . . . . . . . 18, 19

*Baker v. Putnal,* 75 F.3d 190 (5th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Betsey v. Turtle Creek Associates*, 736 F.2d 983 (4th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . .  7

*Bronson v. Crestwood Lake Section 1 Holding Corp.*,
724 F. Supp. 148 (S.D.N.Y. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3, 14, 20

*Bronson v. Crestwood Lake Section 1 Holding Corp.*,
1990 WL 29366 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS)*
*v. MSP Crossroads Apartments LLC*, 2016 WL 3661146 (D. Minn. 2016) . . . . . . . . . . . . . . . .  3

*Davis v. Mansards*, 597 F. Supp. 334 (N.D. Ind. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526 (N.D. Tex. 2000) . . . . . . . . . .  15, 21, 24

*Dillon v. AFBIC Dev. Corp.*, 597 F.2d 556 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . .  25

*Gallagher v. Magner*, 619 F.3d 823 (8th Cir. 2010), *cert. dismissed ,*
565 U.S. 1187 ( 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

*Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

*Glover v. Crestwood Lake Section 1 Holding Corps.*, 746 F. Supp. 301 (S.D.N.Y. 1990) . . . .  20

*Grant v. Smith*, 574 F.2d 252 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*,
641 F. Supp. 2d 563 (E.D. La. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12, 21

*Griggs v. Duke Power Co.*, 401 U.S. 424  (U.S. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926 (2d Cir.),
*aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*,
488 U.S. 15 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6, 11, 13, 14, 15

*Inclusive Cmtys. Project, Inc. v. Tex. Dept. of Housing & Cmty. Affairs*,
749 F.Supp.2d 486 (N.D. Tex. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22, 24

*Inclusive Cmtys. Project, Inc. v. Texas Dept. of Hous. and Cmty. Affairs*,
2016 WL 4494322 (N.D. Tex. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5, 22

*Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303 (10th Cir. 2005) . . . . . . . . . . . . . . . . . .   25

*Icon Laser Sols LLC v. Abercrombie & Fitch, Co.*, 2016 WL 7379138 (N.D. Tex. 2016) . . . . .   1

*In re Katrina Canal Breaches Litig.*, 495 F.3d 191 (5th Cir.2007) . . . . . . . . . . . . . . . . . . . .   1, 5

*Jones v. Travelers Cas. Ins. Co. of Am.*, 2015 WL 5091908 (N.D. Cal. 2015) . . . . . . . . . . . .   24

*Kaye v. Lone Star Fund V* (U.S.), L.P., 453 B.R. 645 (N.D. Tex. 2011) . . . . . . . . . . . . . . . . .   4

*Kennedy v. City of Zanesville, OH*, 505 F. Supp. 2d 456 (S.D. Ohio 2007) . . . . . . . . .   22, 24, 25

*L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . .   4

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482
(7th Cir. 2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 338 (2012) . . . . . . . . . . . . . . . . . . . . . . .   6

*Meyer v. Holley*, 537 U.S. 280 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . .   21

*Montgomery County v. Glenmont Hills Associates Priv. World
at Glenmont Metro Ctr.*, 936 A.2d 325 (Md. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Payton v. Reynolds Associates*, 955 F.2d 247 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Ragin v. N.Y. Times Co.*, 923 F.2d 995 (2d Cir. 1991),
*cert denied*, 502 U.S. 821 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . 6

*Spivey v. Robertson,* 197 F.3d 772 (5th Cir.1999), *cert. denied,*
530 U.S. 1229 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248 (1981) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*,
___ U.S. ___, 135 S. Ct. 2507 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 11, 12, 13

*United States v. City of Black Jack, Missouri*, 508 F.2d 1179
(8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*United States v. Hous. Auth. of City of Chickasaw*, 504 F. Supp. 716 (S.D. Ala. 1980) . . . . . . . 4

*Walker v. City of Mesquite,* 169 F.3d 973 (5th Cir. 1999), *cert. denied,*
528 U.S. 1131 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Statutes**

42 U.S.C. § 1437f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

42 U.S.C. § 1982 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 22, 23, 25

42 U.S.C. § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23, 25

Tex. Local Gov't Code § 250.007 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Regulations**

24 C.F.R. § 100.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

24 C.F.R. § 100.500 (b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Miscellaneous**

S.REP. No. 105–21 (1997); 1997 WL 282462 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Claims covered by Defendants' motion.**

ICP asserts two claims against all Defendants: 1) a disparate impact claim under 42 U.S.C. § 3604(a) challenging all Defendants' policy not to negotiate with or rent to Housing Choice Voucher (voucher) households. Complaint ¶ 117,[1] and 2) a disparate treatment claim under 42 U.S.C. § 3604(a) and 42 U.S.C. § 1982 challenging all Defendants' refusal to negotiate with or enter into leases with ICP to sublease to ICP's voucher clients because of the race and color of ICP's voucher clients. Complaint ¶ 118. These are the claims at issue in the Legacy and HLI White Rock motion to dismiss. Document 32.

**The standard of review for Rule 12(b)(6) motions.**

The standard of review is set out in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir.2007); and *Icon Laser Sols LLC v. Abercrombie & Fitch, Co.*, 2016 WL 7379138, at *1 (N.D. Tex. 2016). The Court evaluates the sufficiency of plaintiff's complaint by "accept[ing] 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " *In re Katrina Canal Breaches Litig.*, 495 F.3d at 205.[2]

**The Complaint shows the existence of Lincoln's policy refusing to negotiate with or rent to voucher households and its application to Defendants' properties.**

The Complaint specifically identifies the race neutral policy being challenged.

> Defendant Lincoln Property Company has a general policy that it will not negotiate with, rent to, or make units available to voucher households. Lincoln Property Company applies this policy in White non-Hispanic areas. Lincoln

---

[1] "Complaint" refers to the ICP Complaint in this case, Document 1.

[2] Defendants dispute the demographic statistics in the Complaint. But those statistics are accepted as true for the Rule 12(b)(6) motion.

Property Company applies this policy even when the combined income of the family and the voucher subsidy meet or exceed the contract rent for the unit. Defendant Lincoln Property Company applies this policy to the multifamily units it manages for the other Defendants. Complaint ¶ 19.

Lincoln's general policy is to not negotiate with or rent to voucher households. Complaint ¶ 51.

The policy is implemented at its multifamily rental projects located in majority White non-Hispanic census tracts in the Dallas metropolitan area focusing on Collin, Dallas, Denton, and Rockwall counties. Complaint ¶ 53.

The policy is implemented for all of the Defendants. Complaint ¶ 117. Lincoln is the property manager for all of the Defendants. Complaint ¶ 18.

The Complaint specifically shows that the policy is applied at the HLI White Rock and the Legacy Defendants' properties.

Lincoln Property Company's policy to not negotiate with or rent to voucher households is implemented at the following multifamily rental projects located in majority White non-Hispanic census tracts in the Dallas metropolitan area with at least some units available at rents that can be paid under the voucher program:

| LPC managed or owned complex | address | city | Zip Code |
|---|---|---|---|
| White Rock Lake Apartment Villas | 9191 Garland Rd. | Dallas | 75218[3] |
| . . . | | | |
| Parkside at Legacy | 5765 Bozeman Dr. | Plano | 75204[4] |
| . . . . | | | |

This list is based on information . . . and statements made by Lincoln Property Company's employees in response to questions whether or not the apartment units were available to voucher households. Complaint ¶ 54.

There are 293 units at the Parkside at Legacy complex in this census tract block group. Lincoln Property Company's policy is to refuse to negotiate with or rent to

---

[3] This project is owned by Defendant HLI White Rock LLC. Complaint ¶ 18.

[4] This project is owned by Defendant Legacy Multifamily North III LLC. Complaint ¶ 18.

-2-

voucher households for the units available at voucher rents in this complex. Complaint ¶ 61.

There are 296 units at the White Rock Lake Apartment Villas in the census tract block group. Lincoln Property Company's policy is to refuse to negotiate with or rent to voucher households for the units available at voucher rents in this complex. Complaint ¶ 62.

The existence of the policy is shown by the advertisements for units at Lincoln's complexes that Lincoln uses in internet web pages by apartment locator services offering Lincoln Property Company's (Lincoln) units to prospective applicants. Complaint ¶ 20. One version uses three separate statements to express the policy:

Our community is not authorized to accept housing vouchers.
Our community is not authorized to accept Section 8 housing.
Our community is not authorized to accept ANY government subsidized rent programs. Complaint ¶ 97.

Another version of the advertisement for units at Lincoln's complexes states:

No 2nd chance leasing, and no vouchers accepted. Complaint ¶ 99.

The policy does not use or allow the use of discretion in deciding whether to rent to voucher holders. The policy is to refuse to negotiate with or rent to voucher households. Complaint ¶¶ 19, 20, 97, 99. Similar policies refusing to negotiate with or rent to voucher holders have been subjected to disparate impact analysis. *Crossroads Residents Organized for Stable & Secure ResiDencieS (CROSSRDS) v. MSP Crossroads Apartments LLC*, 2016 WL 3661146, at *4 (D. Minn. 2016) (refusing to participate in Section 8 program and other rental policies); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 154 (S.D.N.Y. 1989) (policy requiring income greater than three times the rent and refusing Section 8 vouchers).

In general, rental policies that make units unavailable because of race are subject to disparate impact standard for liability determinations. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d

-3-

246, 248 (9th Cir. 1997) (use of a No AFDC policy as a basis for refusing to negotiate for or rent available units); *Alexander v. Edgewood Mgmt. Corp.*, 2016 WL 5957673, at *3–4 (D.D.C. 2016) (tenant selection plan)*; L.C. v. LeFrak Org., Inc.*, 987 F. Supp. 2d 391, 402 (S.D.N.Y. 2013) (facially neutral policy disadvantaging applicants who are recipients of housing subsidies); *United States v. Hous. Auth. of City of Chickasaw*, 504 F. Supp. 716, 730 (S.D. Ala. 1980) (residency requirement in tenant selection criteria).

**Defendants go outside the Rule 12(b)(6) record to assert there is no policy, only a non-discriminatory, discretionary, business judgment not to participate in the voucher program.**

Defendants' assertion that there is no policy, only a discretionary decision not to participate in the voucher program, is outside the scope of Rule 12(b)(6) record. Generally the review is limited to the face of the pleadings. *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996); *see also Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999), *cert. denied,* 530 U.S. 1229 (2000); *Kaye v. Lone Star Fund V* (U.S.), L.P., 453 B.R. 645, 664 (N.D. Tex. 2011).

The Complaint does not plead that the policy had its origin in the Defendants' exercise of their business judgment and discretion in deciding whether to participate in a voluntary program. This assertion is found only in Defendants' Brief, pages 4,10[5]. The Brief cites nothing to suggest that the assertion of discretion and business judgment is subject to judicial notice, or is part of an exhibit to the complaint, or is referred to in documents upon the terms and effect of which the complaint relies heavily and which are, thus, rendered "integral" to the complaint. The alleged facts of discretionary business judgment are not properly before the Court on this motion.

---

[5] "Defendants' Brief" or "Brief" refers to Document 32, the Legacy and HLI White Rock Defendants' Motion to Dismiss.

*Katrina Canal Breaches Litig.,* 495 F.3d at 205.

**The asserted origin of a policy in the discretionary business judgment of a defendant does not insulate the policy from disparate impact review.**

Even if the non-Complaint based fact assertions are considered, there is no authority to support the argument that the origins of a policy insulate the policy from disparate impact review. The incorporation of this argument into precedent would convert the disparate impact standard into an intent standard whereby plaintiff would have to disprove the assertion of race neutral intent. This is not the law. *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, ___ U.S. ___, 135 S. Ct. 2507, 2525 (2015); 24 C.F.R. § 100.500.

Defendants assert that *Inclusive Cmtys. Project, Inc. v. Texas Dept. of Hous. and Cmty. Affairs*, 2016 WL 4494322 (N.D. Tex. 2016) is a case on point. Their Brief states:

> Defendants' "use of discretion" in choosing not to participate in a voluntary program "'itself raise[s] no inference of discriminatory conduct.'" *ICP VII*, 2016 WL 4994322 at *8 (quoting *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1369 (5th Cir. 1992)).

The case is not on point. The opinion cited does not mention a "voluntary program" or discuss the use of discretion in choosing not to participate in a voluntary program in any context. The context of the full sentence from the opinion makes this clear. There is no mention of a voluntary program, only the need for both an impact and a causal link. *Inclusive Communities Project, Inc.*, 2016 WL 4494322, at *8.

The discussion of discretion in the *Inclusive Communities Project, Inc* opinion was on the issue whether the Texas Department of Housing and Community Affairs (TDHCA) discretionary allocation of low income housing tax credits could be analyzed under the disparate impact rule. The TDHCA policy at issue in that case explicitly invoked the use of discretion in each decision

-5-

whether or not to allocate tax credits. *Id*. at *5. To the contrary, the Defendants' policy in this case leaves nothing to discretion. The Defendants refuse to negotiate with or rent to any voucher household. This policy is implemented by Lincoln's staff persons at each of Defendants' specific projects in White areas. Complaint ¶ 54, page 19.

   If the adoption of a policy on the sound business discretion of the landlord, the housing agency, the real estate agency, or the city zoning agency exempts that policy from disparate impact review, there will be little left of the standard. One reason for the disparate impact standard is that it subjects policies that "bear no relation to discrimination upon passage, but develop into powerful discriminatory mechanisms when applied" to disparate impact review. *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988). Even if the Defendants' policy had an innocent origin, the Complaint shows the discriminatory effects making that policy a powerful discriminatory mechanism when applied. Complaint ¶¶ 55 - 59, 61 - 74.

   The exercise of sound business discretion without discriminatory intent in the adoption of employment rules did not prevent either the adoption of or the application of the Title VII disparate impact standard to those rules in *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (U.S. 1971). Upper level, top management adopted employment policies are still subject to the Title VII disparate impact standard. *Scott v. Family Dollar Stores, Inc.*, 733 F.3d 105, 116–17 (4th Cir. 2013). The business judgment to maximize profits by the adoption of business employment policies does not exempt those policies from Title VII disparate impact review. *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012), *cert. denied*, ___

U.S. ___, 133 S.Ct. 338 (2012). The origin of a policy in sound business judgment does not exempt tenant selection policies from Title VIII review. For example, the exercise of discretion to adopt an adults only rental policy did not insulate that policy from disparate impact review. *Betsey v. Turtle Creek Associates*, 736 F.2d 983, 985, 988 - 989 (4th Cir. 1984). There is no authority exempting Defendants' policy refusing to rent to voucher households from the disparate impact standard.

**The Complaint shows direct causation between the policy and the exclusion of the predominantly Black voucher holders.**

The Complaint shows direct causation between the challenged policy and the exclusion of the predominantly Black voucher holders from Defendants' apartments in majority White non-Hispanic census tracts. The causation pleaded is simple and direct. There are voucher tenants eligible for and who meet Defendants' rental criteria and who would rent units at Defendants' apartments. Defendants implementing the policy will not negotiate with or rent to these voucher households. This makes the units in Defendants' projects unavailable for voucher households. Complaint ¶¶ 2, 19 - 20, 31, 53 - 54, 73, 91, 110.

> 2. . . . Defendant Lincoln Property Company has a general policy that it will not negotiate with or rent to households with vouchers. Lincoln Property Company applies this policy in White non-Hispanic areas. Lincoln Property Company applies this policy even when the combined income of the family and the voucher subsidy meet or exceed the contract rent for the unit.
> . . .
> 19. Defendant Lincoln Property Company has a general policy that it will not negotiate with, rent to, or make units available to voucher households. . . . Defendant Lincoln Property Company applies this policy to the multifamily units it manages for the other Defendants.
> 20. Lincoln Property Company advertises its policy of refusing to negotiate with or rent to voucher households. Lincoln Property Company places the advertisements with internet apartment locators seeking applicants for vacant Lincoln Property Company units.. . .
> . . .

31. Lincoln Property Company and the other multifamily property management companies with rental units available at voucher program rents consistently refuse to rent to voucher families.

. . .

53. Lincoln Property Company's policy to not negotiate with or rent to voucher households is implemented at its multifamily rental projects located in majority White non-Hispanic census tracts in the Dallas metropolitan area focusing on Collin, Dallas, Denton, and Rockwall counties. . . .

54. Lincoln Property Company's policy to not negotiate with or rent to voucher households is implemented at the following multifamily rental projects located in majority White non-Hispanic census tracts in the Dallas metropolitan area with at least some units available at rents that can be paid under the voucher program:

. . .

73. The Lincoln Property Company policy makes Lincoln Property Company's managed multifamily units unavailable to a population that is disproportionately Black or African American households based on the percent of the Black or African American renter households that are income eligible for vouchers compared the percent of the White population that is income eligible for vouchers.

. . .

91. ICP's voucher clients are predominantly Black. ICP has Black voucher clients who are eligible under Lincoln Property Company's Application Criteria and with whom ICP would have entered into subleases for available units. The Defendants had units available in non-minority concentrated, high opportunity areas for which the contract rent was within the amount that could have been paid under the voucher program. Defendants refused to either negotiate or enter into leases pursuant to ICP's offer. Units continue to be available at the contract rents that could be paid under the voucher program.

. . .

110. The Dallas area voucher households are predominantly Black. There are Black voucher clients who are eligible under Lincoln Property Company's Application Criteria and who would have entered into leases for available units. The Defendants had units available in non-minority concentrated, high opportunity areas for which the contract rent was within the amount that could have been paid under the voucher program. Defendants refuse to either negotiate or enter into leases with voucher households unless required to do so by law or other government requirement. Units continue to be available at the contract rents that could be paid under the voucher program.

There are no non-parties in the causation chain and there is no indirect action involved.

The units at Defendants' properties in majority White non-Hispanic census tracts are made

unavailable by Defendants' uncontested refusal to negotiate with or rent to voucher households.

Complaint ¶ 61, 62. The Complaint shows causation. ICP does not have the burden to show that the Defendants were a cause of the underlying racial segregation in the area.[6]

**The disparate impact burden does not require showing that the pre-existing conditions of community wide racial segregation and discrimination were caused by the Defendants' discriminatory housing practice.**

The Complaint shows the facts of the pre-existing conditions of community wide racial segregation and the racial disparities in the composition of the groups in need of or receiving low income housing assistance and the groups without such need. Racial segregation - Complaint ¶¶ 30, 31, 53, 54, 57, 59, 61 - 63, Exhibits 2 - 4. Racial disparities - Complaint ¶¶ 23, 24, 56, 66 - 68, 71, 72, 74, 91, 110. The existing conditions of racial segregation and racial disparities in the groups in need of or receiving assisted housing have many causes. The only cause required for disparate impact is that which links the discriminatory housing practice with the discriminatory impacts alleged to have been caused by the practice. The size of the area being affected by the discriminatory practice can be as small as a single apartment complex or a single neighborhood. *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 95, 113–14 (1979). The complaints shows the effects of the challenged policy in just such a neighborhood. Complaint ¶ 59, 61 - 63.

The Complaint does not need to allege causation between the challenged policy and the widespread, pre-existing racial segregation and racial disparities in the Dallas area. The Complaint does not need to show the multiple causes of the widespread, pre-existing segregation in order to state a claim for relief against Defendants. This rule is set in several cases the U.S. Supreme Court characterized by stating "Suits targeting such practices reside at the heartland of

---

[6] ICP does not present a removal of existing affordable housing claim such as the one in *Gallagher v. Magner*, 619 F.3d 823, 836 (8th Cir. 2010), *cert. dismissed,* 565 U.S. 1187 (2012).

disparate-impact liability." *Texas Dep't of Hous. & Cmtys. Affairs*, 135 S. Ct. at 2521 - 2522.

One of those heartland cases was *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1186 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042 (1975). The opinion specifically holds that the relevant causal link is between the discriminatory impact - perpetuating segregation - and the defendant's own action. There is no requirement to prove that the defendant was the only cause or even a major cause or a cause at all of the pre-existing racial segregation. This precedent directly contradicts the Defendants' argument that pleading pre-existing racial segregation in the Dallas area with multiple causes requires dismissal of the ICP complaint.

The *Black Jack* opinion found:

1) a discriminatory effect caused by the Town's zoning action excluding one apartment complex was to foreclose 85 percent of the blacks living in the metropolitan area from obtaining housing in the Town of Black Jack,

2) there were multiple causes of the underlying racial segregation in the St. Louis Metropolitan area that exacerbated but did not exempt or excuse the Town's own liability for its exclusionary actions. The opinion stated:

> The discriminatory effect of the ordinance is more onerous when assessed in light of the fact that segregated housing in the St. Louis metropolitan area was
>
> * * * in large measure the result of deliberate racial discrimination in the housing market by the real estate industry and by agencies of the federal, state, and local governments. * * * *City of Black Jack, Missouri*, 508 F.2d at 1186.

The opinion explicitly recognized there were other causes of segregation still at work in the St. Louis area and the affordable housing proposal rejected by the Town was designed to prevent the perpetuation of this widespread racial segregation. The opinion stated:

-10-

> Black Jack's action is but one more factor confining blacks to low-income housing in the center city, confirming the inexorable process whereby the St. Louis metropolitan area becomes one that 'has the racial shape of a donut, with the Negroes in the hole and with mostly Whites occupying the ring.' . . . Park View Heights was particularly designed to contribute to the prevention of this prospect so antithetical to the Fair Housing Act. *Id*.

The Court of Appeals went through the other disparate impact liability steps, found discrimination, and then declared the zoning invalid and directed the District Court to enter a permanent injunction. *Id*. at 1188.

Another relevant case that was also identified by the U.S. Supreme Court as one of the cases that "reside at the heartland of disparate-impact liability" is *Huntington Branch, N.A.A.C.P.*, 844 F.2d 926.[7] The *Huntington* opinion set out the facts of the pre-existing racial segregation and racial disparities but did not require proof the zoning at issue was a cause of the pre-existing racial segregation and racial disparities. The Town of Huntington was majority White and racially segregated. *Id.* at 929. A disproportionately large percentage of families in existing subsidized projects were minority. *Id*. There were substantial racial disparities between the persons eligible for, in need of, and receiving affordable low income housing assistance and those who did not need and were not receiving such assistance. *Id.* at 938. The plaintiff was not required to trace these conditions to the discriminatory practice at issue which was a zoning ordinance that limited multifamily housing to minority areas. The relevant causal link was between the zoning and the proposed project. A developer applied for a zoning change outside the minority area for an affordable housing project. The change was denied. The zoning ordinance caused the perpetuation of racial segregation and an adverse effect on the Black

---

[7] *Texas Dep't of Hous. & Cmtys. Affairs*, 135 S. Ct. at 2521 - 2522.

population without regard to the causes of the pre-existing segregation and disparities. *Id.*

The third case cited by the U.S. Supreme Court as one of the cases that "reside at the heartland of disparate-impact liability" also involved evidence of pre-existing racial segregation and racial disparities. *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563 (E.D. La. 2009).[8] This case took into account the pre-existing racial segregation and racial disparities in the New Orleans area. *Id*. at 567 - 569. The plaintiff was not required to prove that these conditions were caused by the discriminatory housing practice at issue, a moratorium on the construction of rental housing. *Id*. at 568.

The Defendants do not cite a single case involving a Fair Housing Act, disparate impact claim in which the plaintiff was required to prove that the pre-existing segregation and discrimination were caused by the discriminatory housing practice that caused the discriminatory effects at issue. The causation that must be shown in the Complaint, and in subsequent evidence, is between the challenged policy and discriminatory effects. As set out above, that causation is direct. Defendants refuse to negotiate or rent to vouchers making Defendants' units in majority White non-Hispanic census tracts unavailable to a predominantly Black population of voucher households. The next section sets out the Complaint paragraphs showing that the magnitude of the discriminatory impacts satisfies the prima facie case of disparate impact.

**The Complaint shows that the extent of both discriminatory impacts - adverse effect on a disproportionately Black group, voucher households, and perpetuation of racial segregation - satisfy the prima facie case standard.**

The discriminatory impact of a discriminatory housing practice arises in two contexts: adverse impact on a particular minority group and harm to the community generally by the

---

[8] *Texas Dep't of Hous. & Cmtys. Affairs*, 135 S. Ct. at 2521 - 2522.

perpetuation of segregation. *Huntington Branch, N.A.A.C.P.*, 844 F.2d at 937.[9]

 The Complaint pleads both contexts. The Complaint shows the extent of both

discriminatory impacts from the infliction of an adverse effect on a predominantly Black group

and the perpetuation of racial segregation.

The Complaint shows that the Defendants' refusal to negotiate with or rent to voucher

holders has the adverse effect of making Defendants' multifamily units unavailable to a

population that is disproportionately Black or African American: 86% Black (DHA) to 81%

Black (all in the metro area). Complaint ¶ 56, 69. The policy directly causes the adverse effect by

refusing to negotiate with or rent to voucher households. The exclusion is total. There are no

vouchers in either of the census tracts in which the Defendants' projects are located. Complaint ¶

61, 62. The extent of this adverse effect on Blacks exceeds the effect that was found to be strong

evidence of discriminatory impact in *Huntington.*

In *Huntington*, the absolute numbers of poor whites (22,160) greatly exceeded the number

of poor blacks (3,671) in the relevant groups. *Id*. at 933. In this case, the absolute number of

Blacks affected (81% of 30,745 total vouchers or 86% of 17,000 DHA vouchers) greatly exceeds

the absolute number of Whites affected (10% of 30,745 total vouchers or 6% of 17,000 DHA

vouchers). Complaint ¶ 56. In addition, the showing of the adverse effect in the Complaint

exceeds what the *Huntington* Court characterized as strong evidence of the adverse impact on

Blacks. The evidence was that "60% of families holding Section 8 certificates are minority, 61%

on waiting list." *Huntington Branch, N.A.A.C.P.*, 844 F.2d at 938. This fact showed "a

---

[9] *Cf*. "Rather, the FHA aims to ensure that those priorities can be achieved without
arbitrarily perpetuating segregation." *Texas Dep't of Hous. & Cmty. Affairs* 135 S. Ct. at 2522.

substantial adverse impact on minorities." *Id*. The Complaint in this case shows that the adverse effect is inflicted upon a population that is over 80% Black. Complaint ¶ 56.

The magnitude of the discriminatory impacts in the Complaint are about the same as the impacts found sufficient in *Bronson*, 724 F. Supp. at 154. There the policy refusing to rent to voucher households excluded a voucher population that was 82% minority. This compares to the over 80% Black voucher population excluded by Defendants' policy. The population eligible by income to rent a unit without using a voucher in *Bronson* was only 14% of the minority population and 28% of the non-minority population. *Id*. While *Bronson* measured the impact by the percent of each race that was eligible, the disparity is similarly large in the Complaint. The total population with incomes high enough to afford Defendants' units without voucher assistance is 19% Black and 53% White. Complaint ¶ 74.

The Defendants do not challenge the pleadings on this discriminatory effect. Their Brief does not mention the discriminatory impact of the adverse effect of making units unavailable to the predominantly Black voucher households.

The Defendants do challenge the pleadings on the perpetuation of racial segregation. The Complaint shows that the Defendants' exclusion of voucher households from their apartment projects and the majority White census tracts in which Defendants' units are located perpetuates the current segregation of the voucher population. On average, the vouchers in the City of Dallas are located in 88% minority census tracts. On average, the voucher households throughout the Dallas metro area are located in 74% minority census tracts. Complaint ¶ 57. This exceeds the segregation of low income housing into an area that was 52% minority which was the racial segregation perpetuated by the zoning ordinance in *Huntington*. The Court found that the

restriction of low income housing needed by minorities to an area already 52% minority showed that the policy significantly perpetuated segregation. *Huntington Branch*, 844 F.2d at 937 - 938. Defendants' policy leaves voucher households in 74% to 88% minority tracts. Complaint ¶ 57.

The policy as implemented at Defendants' properties may also have the effect of perpetuating racial segregation in the Zip Codes and the cities where the projects are located. Complaint ¶ ¶ 30, 31, 58, Complaint Exs. 3, 4. *Dews v. Town of Sunnyvale, Tex.*, 109 F. Supp. 2d 526, 567 (N.D. Tex. 2000). Whether this effect exists at the city level, e.g., Plano, is not appropriately determined at the pleadings stage. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 377–78 (1982).

**ICP's litigation that seeks remedies for local and federal government racial segregation does not weaken the causal link between the Defendants' policy and the discriminatory impacts caused by that policy.**

The Defendants cite ICP's litigation seeking to remedy racial segregation and racial discrimination in the Dallas area that has been caused by various government agencies. They suggest that this litigation shows that the Defendants have not caused the discriminatory impacts from the implementation of the policy challenged in this case. Brief pages 9 - 10. The Brief does not attempt to explain how the various government defendants in the cases listed break the chain of causation alleged in this case. For example, the roles of the various entities involved in the tax credit litigation do not involve any action that intervenes between the Defendants' implementation of the policy not to negotiate with or rent to voucher households and the complete absence of vouchers in the Defendants' projects or in the census tracts where the projects are located. Complaint ¶¶ 61, 62.

The most relevant cases are the *ICP v. HUD* cases filed to require the use of higher

-15-

maximum rents for the voucher program. But these cases do not break the causal chain between Defendants' policy and the discriminatory effects. It is the increased voucher maximum rents from these cases that make Defendants' units affordable to voucher households and thus removes a reason not to negotiate with or rent to voucher households. Complaint ¶¶ 38, 39.

The Complaint shows the reasons for ICP's activities including its litigation. ICP's mobility program and the related assistance to its DHA voucher clients are part of the remedy in the *Walker v. HUD* public housing desegregation case. Complaint ¶ 9. The Court of Appeals for the Fifth Circuit recommended a mobility program to serve the Black voucher households wishing to move out of segregated areas. The Court stated that the vigorous mobility program must be one that:

> . . . serves the relocation needs and concerns of black families, reaches out to white landlords, affords adequate fair market rent exceptions, and combats illegal private discrimination. *Walker v. City of Mesquite*, 169 F.3d 973, 987–88 (5th Cir. 1999), *cert. denied*, 528 U.S. 1131 (2000).

The United States District Court adopted the housing mobility program as part of the remedy. ICP obtained adequate fair market rents and has been providing housing mobility services to its DHA voucher clients since 2005. Complaint ¶ 9. This case seeks to combat illegal private discrimination as part of the mobility program.

**The pleading that the policy is not necessary for potential assertions of business reasons is specific and set out with particularity.**

The Complaint shows the interests that might be raised by Defendants in the second stage of the disparate impact burden of proof. 24 C.F.R. § 100.500(b)(2). The Complaint is indefinite because none of the Defendants responded to requests for negotiation. The Defendants have not provided any information on the substantial, legitimate, non-discriminatory interests they assert

-16-

the policy is necessary to achieve. Complaint ¶ 75. The Complaint does not assert that the interests noted are the actual interests that Defendants will raise or that the Defendants can meet their burden to show that the policy is necessary for a substantial, legitimate, and non-discriminatory interest. The Complaint states:

> If Defendants' interests that they rely upon include all or part of the trade associations' asserted interests, those interests do not require the policy. Complaint ¶ 76.

The Complaint shows that the policy is artificial, arbitrary, and unnecessary. The HUD Zip Code voucher rents provide for payments that meet the contract rents for at least some of the units in Defendants' projects. Complaint ¶¶ 61, 62, 77. There are existing landlord bonus or incentive payments that compensate for any risks of delayed payment or non-payment. The bonuses also compensate for the costs or risks involved in using any HUD required forms. Complaint ¶ 79. Low income assisted households have significantly lower collection losses and vacancy losses than non-assisted renter households. These costs or the risks of these costs can be covered by the existing bonus and incentive programs. Complaint ¶ ¶ 79, 80. Defendants negotiate with and rent to non-voucher tenants posing higher risks of delayed payment or non-payment. The Defendants negotiate the use of guarantor/co-signer agreements and higher deposits for these non-voucher tenants. Complaint ¶ 88. The Defendants' property manager, Lincoln, manages apartment complexes in predominantly minority areas where Lincoln does negotiate with and rent to voucher households. Lincoln manages these properties in conformity with reasonable business practices. Complaint ¶ 89. The refusal to rent to voucher households is not necessary to achieve reasonable business practices. Complaint ¶ 34.

**The Complaint specifically shows less discriminatory alternatives to the policy.**

The Complaint shows specific details of less discriminatory alternatives to the policy.

-17-

Complaint ¶¶ 10, 11, 39 - 42, 81 - 88, Complaint Exhibit 1 letters to landlords. One less

discriminatory alternative, the ICP sublease/guarantor program was negotiated with the

Apartment Association of Greater Dallas. The President of the Association during the

negotiations, Mr. Michael Clark, said the sublease/guarantor proposal has merit. Ms. Kathy

Carlton, Director of Government Affairs for AAGD has encouraged AAGD members to look at

the ICP sublease/guarantor proposal. Ms. Carlton stated the AAGD had worked with ICP to

identify roadblocks to participation in the voucher program and that ICP had done a good job

addressing those roadblocks. Complaint ¶ 34. The Complaint shows the existence of less

discriminatory alternatives, details of those alternatives, whether those alternatives have been

used, and that the alternatives were presented to Defendants. Complaint Exhibit 1.

**There is no Fair Housing Act exemption for landlord discrimination against voucher recipients.**

There is no authority for the assertion that there is a federal law preempting the

application of the Fair Housing Act or other non-discrimination laws to a landlord's decision to

discriminate against voucher households. The only quote from the case cited by Defendants does

seem to stand for the proposition that no federal law can prevent a landlord from discriminating

against a voucher household simply because of the use of the voucher. Defendants' Brief, page

13, relies on the following quote:

> Federal law does not require landlords to accept housing vouchers, and landlords
> who do not accept vouchers are not required to approve tenants merely because
> they are voucher holders. *Austin Apartment Ass'n v. City of Austin*, 89 F. Supp. 3d
> 886, 890 (W.D. Tex. 2015).

The full context of the quoted language significantly narrows the scope of the federal

laws referenced to one, the voucher program statute, 42 U.S.C. § 1437f. There is no reference to

a Fair Housing Act exemption for landlords. See *Austin Apartment Ass'n* 89 F.3d at 890. In

-18-

addition, the *Austin* opinion goes on to forcefully reject the argument that any provision of federal law provides landlords with the legal right to discriminate against voucher households simply because of their use of a voucher. *Id*. at 895, 896 n 2.

> Nothing in that provision [ 42 U.S.C. § 1437f(d)(1)(A)] implies a landlord should have the right to discriminate against a voucher holder simply because he or she is a voucher holder. Franklin Tower One, 725 A.2d at 1113. *Austin Apartment Ass'n* 89 F. Supp. 3d at 896 n 2.

The Court found Congressional intent to assist tenants, not to protect landlords' rights. *Id*. at 895.

The argument that the Fair Housing Act does not apply to landlord discrimination against voucher recipients is also directly contradicted by the statement of Congressional intent. The Senate Committee on Banking, Housing, and Urban Affairs, predicted that the repeal of the take one, take all provision of the voucher program would not "adversely affect assisted households because protections will be continued under . . . the Fair Housing Act and the Americans with Disabilities Act." S.REP. No. 105–21, at 86 (1997); 1997 WL 282462 * 36. The report made a specific finding that the clear intent of Congress was not to excuse discrimination by landlords but to expand the housing choices available for voucher households. *Id*.

The state law provision cited by Defendants does not mandate voluntary participation in the voucher program and exempt landlords from liability under the Fair Housing Act for discrimination against voucher households. Tex. Local Gov't Code § 250.007 bans cities and counties from passing or enforcing ordinances that would make voucher discrimination illegal. If the ban did extend to granting landlords' exemptions from Fair Housing Act liability for discriminatory housing practices, the law would be invalid. 42 U.S.C. § 3615. The issue is being litigated in *Inclusive Communities Project, Inc., v. Greg Abbott*, et al., 3:17-CV-440-D (N.D.

Tex.).

The relief sought does not require an order that Defendants participate in the voucher program. The remedy for voucher discrimination ordered in *Bronson*[10] barred consideration of voucher status but approved the landlord's right to consider the following standards in its decision whether to negotiate with or rent to voucher households. The approved criteria included: (1) Rent payment history (includes a demonstrated ability to pay rent on time and comments from present and former landlords); (2) Credit history; (3) Housekeeping habits; (4) History of violence; (5) History of drug or alcohol abuse; and (6) Availability of sufficient funds to cover rents and projected needs. The consideration of the rent related items (1), (2), and (6) was not necessary if the tenants had made other satisfactory arrangements to guarantee the timely payment of the rent. *Bronson*, 724 F. Supp. at 158 n 14.[11] The named plaintiffs had already arranged for their rent to be paid directly to the landlord by third parties with guaranteed access to their income. One plaintiff also had a co-signor on her lease. *Id*. at 157. [12]

This relief is more specific than but consistent with the general statement of relief requested by ICP on the claims against these Defendants:

---

[10] *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 157 (S.D.N.Y. 1989); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 1990 WL 29366, at *2 (S.D.N.Y. 1990).

[11] The Complaint shows that ICP's clients and other voucher households meet the Defendants' tenant selection criteria. Complaint ¶¶ 5, 6, 25, 91, 110.

[12] This case was later decided on the basis of the statute requiring recipients of federal housing subsidies to refrain from discrimination against voucher households. *Glover v. Crestwood Lake Section 1 Holding Corps.*, 746 F. Supp. 301, 309 (S.D.N.Y. 1990).

-20-

a) a permanent injunction enjoining Defendants from engaging in the policy of refusing to negotiate with or rent to voucher households;

b) an order enjoining Defendants from refusing to negotiate with ICP concerning leasing units to ICP using the ICP sublease/guarantor program;

ICP also seeks related declaratory relief. Complaint page 37.

A remedy that just requires legitimate business reasons for refusing to rent to voucher households is not forced participation in the voucher program. *Montgomery County v. Glenmont Hills Associates Priv. World at Glenmont Metro Ctr.*, 936 A.2d 325, 335 - 340 (Md. 2007). A prohibition against refusing to rent because of the voucher status of an applicant is not violated when the landlord rejects a voucher tenant based on legitimate business reasons. *Payton v. Reynolds Associates*, 955 F.2d 247, 253 - 254 (4th Cir. 1992).

**ICP can assert claims for disparate impact and disparate treatment and prevail on both.**

ICP can assert and prevail on both its claim for disparate impact based on the challenged policy and its claim that the Defendants refusal to negotiate and to rent to ICP is disparate treatment based on the race and color of ICP's clients. Courts uniformly entertain both disparate treatment and disparate impact claims and apply the relevant standard to each claim. In *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 615, 620 (2d Cir. 2016), the Court affirmed the District Court's finding of discriminatory intent and remanded for further proceedings on the disparate impact claim. There is no suggestion in the opinion that prevailing on the intent claim barred the impact claim. The Court found both discriminatory intent and disparate impact in *Greater New Orleans Fair Housing Action Center*, 641 F.Supp.2d at 577 -578. In *Dews*, 109 F. Supp. 2d at 530 - 533, 563 - 573, the Court found both discriminatory intent and disparate impact.

-21-

The Defendants' discussion of whether a subjective or discretionary policy should be subject to the disparate treatment or disparate impact burden of proof is not relevant to this case. The policy challenged is neither subjective nor discretionary. The policy is to refuse to negotiate with or rent to voucher households. Complaint ¶¶ 19, 20, 97, 99. The discretionary policy analysis in *Inclusive Cmtys. Project, Inc.*, 2016 WL 4494322 at *7 is not applicable.

**The Complaint shows disparate treatment based on the modified *McDonnell Douglas Corp*. framework as applied in Fair Housing Act cases.**

The *McDonnell Douglas Corp*. framework of Title VII is often applied in Fair Housing Act cases and cases under 42 U.S.C. §1982. *Inclusive Cmtys. Project, Inc. v. Tex. Dept. of Housing & Cmty. Affairs*, 749 F.Supp.2d 486, 500 (N.D. Tex. 2010); *Kennedy v. City of Zanesville, OH*, 505 F. Supp. 2d 456, 492–95 (S.D. Ohio 2007). ICP's Complaint sets out the facts of the disparate treatment claim against these Defendants. Complaint ¶¶ 3, 5, 6, 14, 25, 36, 54, 74, 89 - 95, 96 - 116.

Under the disparate treatment burden of proof standard, a plaintiff must present sufficient evidence to make out a prima facie case of discrimination thereby giving rise to an inference of discrimination. If the plaintiff meets this burden then the burden shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for the challenged actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 252 (1981). The plaintiff may then show that the reason offered by the defendant is merely a "pretext" for unlawful discrimination. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 143, 147-148 (2000). The requirements of a prima facie case can be flexible based on the facts presented. *Inclusive Cmtys. Project, Inc*, 749 F.Supp.2d at 501.

-22-

The Complaint alleges disparate treatment in both the refusal to negotiate and the refusal to rent. Complaint ¶ 92 - 93. The refusal to negotiate based on race precedes the refusal to rent and is a separate violation of 42 U.S.C. § 3604(a). *Grant v. Smith*, 574 F.2d 252, 255 (5th Cir. 1978); *Davis v. Mansards*, 597 F. Supp. 334, 343 (N.D. Ind. 1984).

As set out below, the Complaint shows the elements of the disparate treatment claim including the prima facie case and other facts supporting the inference of discrimination.

**The Defendants' refusal to negotiate with or enter into leases with ICP is disparate treatment.**

The Defendants' refusal to negotiate with or enter into leases with ICP is disparate treatment based on the race and color of ICP's voucher clients and violates 42 U.S.C. § 3604(a) and 42 U.S.C. § 1982. Complaint ¶ 118. The difference in treatment is between the predominantly Black voucher households who, with the voucher, can afford and qualify for Defendants' units and the predominantly White renter households who can afford the units without the voucher. Complaint ¶ 74.

ICP's voucher clients are predominantly Black. ICP has Black voucher clients who are eligible under Lincoln's Application Criteria and with whom ICP would have entered into subleases for available units. Complaint ¶¶ 5, 6, 25, 91, 110. Defendants had units available in non-minority concentrated, high opportunity areas for which the contract rent was within the amount that could have been paid under the voucher program. ICP made the offer to negotiate for units at the Lincoln Property managed apartment complexes for participation in ICP's sublease program. Complaint ¶¶ 3, 14, 36, 54, 91 - 92. The offer to negotiate and rent was rejected and the units continued to be offered for lease. Complaint ¶¶ 91 - 95. These facts show the prima facie

-23-

case of disparate treatment under the *McDonnell Douglas* disparate treatment standard as

modified for the Fair Housing Act and provide the basis for an inference of discrimination.

*Inclusive Cmtys. Project, Inc*, 749 F.Supp.2d at 500; *Kennedy*, 505 F. Supp. 2d at 492–95.

 The Complaint shows other facts that support the inference.

 The non-voucher tenants that can afford to rent the Defendants' units are

disproportionately White, 53%. The non-voucher tenants that can afford to rent the Defendants'

units are only 19% Black. Complaint ¶ 74.

 The advertisements run by Lincoln for at least the Parkside at Legacy project show a

preference for Whites and discourage the predominantly Black group of voucher households.

Complaint ¶¶ 95 - 116. *Ragin v. N.Y. Times Co.*, 923 F.2d 995, 1000 (2d Cir. 1991), *cert denied*,

502 U.S. 821 (1991). The advertisements convey the same stereotypes of voucher households

whose use has been ruled to constitute circumstantial evidence of discriminatory intent. *Jones v.*

*Travelers Cas. Ins. Co. of Am.*, 2015 WL 5091908, at * 2 (N.D. Cal. 2015); *Dews*, 109 F. Supp.

2d at 547 - 548.

 The Complaint shows that these perceptions of voucher households are present in the

Dallas area. One local example of invocation of the stereotype perception is the 2015 incident

involving Black guests at a McKinney neighborhood pool. White residents taunted the Blacks as

being "Section 8" and needing to leave the pool and the neighborhood and go back to their

"Section 8" homes. Complaint ¶ 102.

 Pretext and discrimination are shown by the Defendants' property manager, Lincoln,

managing apartment complexes in predominantly minority areas where Lincoln does negotiate

with and rent to voucher households. These apartment complexes include complexes required by

-24-

law or contract to not discriminate against voucher households because of their status as voucher program participants. There are voucher household tenants in these complexes. Lincoln manages these properties in conformity with reasonable business practices while negotiating with and renting to voucher households. Complaint ¶ 89.

Any reasons given post commencement of litigation for the refusal to negotiate or rent to ICP for sublease to voucher holders will be of little weight and will be evidence of pretext. *Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1311 (10th Cir. 2005); *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001).

The evidence shown in the Complaint gives rise to an inference of discrimination. *Kennedy,* 505 F. Supp. 2d at 493 - 494.

**Vicarious liability.**

The pleaded facts and reasonable inferences show that Lincoln is implementing either its own or its owners' or both its own and its owners' policy refusing to negotiate with or rent to voucher households. Lincoln's implementation of the policy as the agent for the owners is enough to subject the owner Defendants to vicarious liability under 42 U.S.C. § 3604(a) and 42 U.S.C. § 1982. *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *Dillon v. AFBIC Dev. Corp.*, 597 F.2d 556, 562-63 (5th Cir. 1979).

**Conclusion.**

The Complaint shows the facts supporting the reasonable inference that the defendants are liable. The claims have facial plausibility and the motion should be denied.

Respectfully Submitted,

/s/ Michael M. Daniel
Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
Attorney for Plaintiff

Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C.
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
Attorney for Plaintiff

<u>Certificate of Service</u>

I hereby certify that on June 14, 2017, I electronically submitted the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case files system of the court. The electronic case files system will send a "Notice of Electronic Filing" to the following individuals who have consented in writing to accept this Notice as service of this document by electronic means: VALERI C. WILLIAMS and CATHLYNN H. CANNON and JENNIFER L. OWEN and THOMAS W. KNIEST and TONYA M GRAY and ARTHUR E. ANTHONY and TAYLOR F. BRINKMAN.

s/ Michael M. Daniel

-26-